213 P.2d 672

SEARS, ROEBUCK & CO. v. INDUSTRIAL COMMISSION et al.

HARRIS v. SEARS, ROEBUCK & CO. et al.

No. 5155.

Supreme Court of Arizona.

Jan. 23, 1950.

Fennemore, Craig, Allen & Bledsoe, of Phoenix, for petitioner.

Robert E. Yount, of Phoenix, (H. S. McCluskey, and Donald J. Morgan, of Phoenix, of counsel), for respondents, Industrial Commission.

Kramer, Morrison, Roche & Perry, Clark & Coker, and J. S. Riggs, of Phoenix, for respondent Helen Harris.

UDALL, Justice.

Petitioner Sears, Roebuck & Co., the employer (hereinafter called Sears), brings before us for review an award of the Industrial Commission of Arizona, dated July 29, 1948, allowing Helen Harris, one of its employees, accident benefits in the

sum of $7,431.13 and compensation of $1,646.16 now due, plus the additional sum of $3.61 per day to continue during applicant's disability. Sears is a self-insurer, qualifying under the provisions of subsection 3, section 56-932, A.C.A.1939.

This case, which represents a unique situation in the administration of the workmen's compensation law, requires a detailing of the various steps taken by the commission, together with the facts presented by the record and which were before the commission when the award was entered.

The applicant, Miss Helen Harris, age 40 years, had been an employee of Sears at its Phoenix establishment for some years prior to June 5, 1945, and at that time was a receiving clerk with her place of employment located in an office on the shipping and receiving platform at the rear of the employer's establishment. Upon reporting for work at approximately 8:00 a. m. of the day referred to, applicant was admitted to her office by a fellow employee. She secured from the office her working garments and then proceeded to the service room where she changed her clothes. She then returned to her office for the purpose of undertaking her duties for the day. Very shortly thereafter a fellow employee discovered her lying on the floor of the office with her head in a pool of blood, her false teeth and glasses lying on the floor in near proximity to her body. She was immediately removed to the shipping room, an ambulance was called, and applicant was then taken in an unconscious condition to Saint Monica's Hospital in Phoenix. There was no eye witness to the accident.

Dr. Barfoot, the company's physician, was first called in attendance and treated her for a scalp laceration and an abrasion and tenderness in the region of her left shoulder. Thereafter, that same day, Dr. Frank J. Milloy, her personal physician, was summoned at her request and she was placed under his care. Applicant remained in the hospital for approximately a week, was then removed to her home where she convalesced for a period of nine weeks. During confinement in the hospital, Miss Harris was visited by a Miss Goodfellow, personnel manager of Sears, who assured her that she had nothing to worry about; that her hospitalization expense, etc., would be taken care of by the company and she could return to work whenever she was able. It appears that Sears protects its employees in cases of nonindustrial accidents under a general health and accident coverage. From this source applicant was compensated during the ten weeks sick leave period and all hospital bills paid. In the latter part of August, 1945, due to economic necessity, applicant returned to her employment (even though she continued to suffer pains in her back and recurring headaches) and proceeded to carry out her duties in an efficient manner until May 2, 1946.

This first fall, the incident of June 5, 1945, was not then considered by any of the parties as an industrial accident, but rather an injury from a fall caused by a fainting or dizzy spell, hence no report was made to the Industrial Commission by the applicant, her employer, or either of the two doctors who attended her. More about this anon.

On May 2, 1946, while commencing to cross North Second Street in the city of Phoenix, in proceeding from one place of her employer's business to another, the applicant fainted and in falling backwards struck her head upon the westerly curb of North Second Street. She was rendered unconscious and a fellow employee, with whom she had started her journey, came to her assistance. An ambulance was ordered and applicant was again transferred to Saint Monica's Hospital where she was first treated by Dr. Carlos C. Craig and subsequently placed under the care of her personal physician, Dr. Frank J. Milloy.

The incident of May 2, 1946, was in due course reported to the Industrial Commission, docketed as case numbered XX-1035, and on July 10, 1946, the commission gave the employer notice of injury and award of temporary disability. On August 19, 1946, however, the commission rendered its findings and award for noncompensable cases, holding in effect that the injuries received by applicant on May 2, 1946, were not received through an accident arising out of her employment. No application for rehearing was filed within the twenty-day period allowed by the rules of the commission.

Following this second accident, the applicant remained totally disabled, could not return to work, and on January 16, 1947, returned to Saint Monica's Hospital for the third time where she remained until August, 1947. The medical experts (including her own physician, Dr. Milloy, who examined and treated her from the time of her first accident) were baffled by her continuing symptoms. Her condition was attributed at different times to various diseases, including a fungus condition, sinusitis, anemia, conversion hysteria, infected teeth, or epilepsy. On February 6, 1947, a herniated disc was suspected, but it was not until April 11, 1947, that a formal diagnosis of herniated cervical disc between the third and fourth cervical vertebrae was made by a consultation board consisting of five medical experts representing the applicant, the employer, and the commission. Dr. H. B. Rainey, a specialist in the field of orthopedic surgery, had previously examined the applicant and conveyed his views to the medical consultation board. Thereafter Dr. Rainey, on September 19, 1947, in Los Angeles, performed "a cervical laminectomy and removed two discs". At the hearing before the commission in April, 1948, applicant testified that since the date of the operation she had not experienced the headaches and back pains from which

she previously suffered and that her recovery to health had been one of marked and steady improvement, though she was still wearing a "Thomas collar" at the time of the hearing.

On February 6, 1948, counsel for applicant filed a petition with the commission reciting applicant's version of the details surrounding both accidents as well as delineating the previous actions taken by the commission, and prayed for: (1) compensation and accident benefits for the injuries alleged to have been received June 5, 1945; or (2) the granting of a rehearing upon the second accident occurring May 2, 1946, designated as case XX-1035, which had been decided August 19, 1946. The commission assumed jurisdiction, a hearing was had on April 2 and 6, 1948, at which the applicant, four doctors, and three lay witnesses testified fully as to not only the medical history but the facts relative to both accidents. Whereupon the commission on May 10, 1948, deeming itself bound by the rule we announced in the case of Guy F. Atkinson Co. v. Kinsey, 61 Ariz. 127, 144 P.2d 547, determined that its order of August 19, 1946 (involving the second accident) had become final and that such matter was therefore res judicata. It took no action as to the first accident. Certiorari was not applied for and counsel for applicant now concede that the determination as to the second accident being res judicata was correct.

Subsequent to the decision of May 10, 1948, applicant filed a motion seeking an adjudication on the first prayer of her petition of February 6, 1948. The commission treated these pleadings as a new case, gave it docket number ZZ-1100, and for the first time requested medical and employer's reports as to the first accident and on July 29, 1948, entered the award here under review.

Sears makes two assignments of error and submits but two propositions of law, which summarized are: (1) that the commission erred in making an award upon a claim for compensation based upon injuries received by the applicant in an accident which *did not arise out of the applicant's employment*, asserting that such action is a violation of article 18, section 8, Constitution of Arizona, and section 56-936, A.C.A.1939; (2) that the commission erred in making an award upon a claim for compensation filed more than one year after the date upon which the alleged injuries are said to have occurred or the right thereto accrued for the reason that it was without jurisdiction to entertain such an application under section 56-967, A.C.A.1939.

We shall first treat assignment number one. Without doubt the accident which is now under consideration occurred "in the course of employment", which expression or term refers to the time, place, and circumstances under which it occurred; i. e. coincident with the employment. The

seriousness of applicant's injury is not questioned and there is sufficient evidence to establish the causal connection between the accident and her injury. But the real question is: Did it "arise out of" the employment? The two terms are not synonymous, as the latter term refers to the origin or cause of the injury. Both the elements, "arising out of" and "in the course of" employment must coexist at one and the same time in order that a claim may be compensable. Goodyear Aircraft Corporation, Arizona Division v. Gilbert, 65 Ariz. 379, 181 P.2d 624. As was said in the case of Ocean Accident & Guarantee Corporation v. Industrial Commission, 32 Ariz. 265, 257 P. 641, 643: "The Compensation Act is not an insurance law requiring the employer to compensate every injury an employee suffers while in his employment, but only those accidental injuries that arise out of and in the course of the employment. As has been well said, to extend the law to cover all injuries sustained by an employee * * * would be giving to employees protection against the common and everyday accidents to which all mankind is daily exposed and make them a privileged class. Compensation must therefore be limited to those employees within the intendment of the legislation providing for it, and not extended to include cases clearly without its intent and purview. * * *"

What is the evidence in the record as to the origin or cause of applicant's injury of June 5, 1945? We shall state this phase of the evidence in some detail. While there were no eye witnesses to the accident, from the physical facts surrounding the finding of applicant's unconscious prone body, her coemployee and supervisor concluded she had fainted. Dr. Barfoot, the employer's physician, reported to the employer on June 27, 1945: "Mrs. Harris states that the morning of the accident she felt very ill at ease, was dizzy and that after she got to the store building she remembers nothing else. She allegedly fell and struck the vertex of the head, producing a laceration."

And at the hearing in April, 1948, he testified in part as follows:

"Q. Now, Doctor, will you please state the circumstances under which you examined the Applicant in June of 1945? A. I was called to see her at St. Monica's hospital. She had fallen while at work and she told me that she had been dazed and dizzy and that she remembered nothing from the injury to the time of her hospitalization. She had complete amnesia for events between her injury and her hospitalization.

"Q. Did she state that she had been dazed and dizzy prior to the fall? A. Yes.

"Q. And that she remembered nothing thereafter until she was hospitalized? A. That is right."

Dr. Milloy, her personal physician, (who saw her the day of the first accident) shortly before her discharge from the hospital inscribed in his own handwriting on the hospital record under progress notes: "Recovered from *effect of fainting* while on her job." (Emp.sup.) At the hearing he was examined as to a statement appearing in a letter he addressed to the commission, under date of February 6, 1947, attributing this accident to her falling from a ladder. He admitted he must have been confused as to the cause of this accident, but he did testify on cross examination that: "* * * And I can remember her telling me of her walking into the— definitely *telling me of her walking into* the office and tripping and striking her head on the desk. I remember that in connection with the first accident. But I don't recall this statement here, she was standing on a ladder."

Dr. Sult who first saw the applicant after the second accident made a written report dated May 3, 1946, in which he recites: "* * * She states that eleven months ago she had some sort of an attack in which she became unconscious, and states that she must have fallen and cut the back of her head. She was in St. Monica's Hospital at that time for one week, and believes this was a 'nervous breakdown'. * * *"

Andrew Baumbert, Jr., investigator for the commission, made an investigation relative to the second accident on June 20 and 21, 1946, and submitted a written report of his findings to the commission. After reviewing the applicant's version of the second accident there appears in his report this comment as to the incident of June 5, 1945: "Helen Harris said about eleven months ago while working in the receiving room she fainted and fell, cutting the back of her head. * * *"

In the month of August, 1946, the commission solicited a supplemental or amended report from the applicant as to the second accident. Over her (applicant's) signature and in her own handwriting there appear on this report the following questions and her answers relative to the first accident: "Have you ever received any other injury? Yes. If so, when? June 5, 1945. Where? At the whse (warehouse) What was its nature? Fainted & cut my head." When the applicant's petition of February 6, 1948, was filed for the first time it was claimed that the first accident was caused by the pocket of applicant's jacket catching on a doorknob in the office where she worked. At the hearing on April 2, 1948, after testifying relative to her arrival at the Sears' establishment, the changing of her clothes, and her return to the office, this self-serving declaration was made: "* * * Knowing I had a lot of work to do I was in a hurry. As I entered the door, come through the door, we had a narrow entrance, close quarters, I caught my jacket pocket on the doorknob and it jerked me

and I slipped and fell and hit the top—in falling my head hit the top of the desk and the foot rest in the office. I don't remember anything further than that other than several hours later I woke up in the hospital."

Mr. John Murphy, Sears' manager of applicant's department, testified that the applicant did not have a jacket on when the fall occurred because he noticed it was hanging in the closet after she was taken to the hospital. The only excuse offered by applicant for belatedly reporting this "jacket catching" incident was a claim of amnesia and a restoration of memory by the cervical discs operation, which latter point is wholly without support insofar as any medical evidence is concerned.

The commission elected to ignore and disbelieve all of the evidence heretofore set forth, i. e., that the first accident was the result of a fainting spell, but rather seized upon the uncorroborated "jacket catching" event first advanced by applicant some two years and eight months after the accident occurred. In the final analysis it is upon this incident and this alone that the award must rest.

The commission takes umbrage at the failure of Sears or its doctor to timely report the first accident so that the commission might have then determined whether it arose out of and in the course of her employment. It asserts that this in itself was a "usurpation by the employer of the jurisdiction of the commission".

When an accident with resulting injury to an employee occurs in the course of employment and there is a question raised as to the origin of such an injury it is of course the sole prerogative of the commission, and not that of the employer, to determine whether or not such injury "arose out of" such employment. On the other hand if the physical facts do not indicate an industrial accident and no claim is made by the employee or any one in her behalf that such is the fact, the law does not require that it be reported to the commission. Section 56-966, A.C.A.1939, does not require the reporting of every injury or accident but only those "arising out of or in the course of employment and resulting in loss of life or injury." If in the instant case applicant became dizzy and fainted causing her injury and subsequent hospitalization there was no duty on her employer or its doctor to report same. Query? How, may we ask, was the employer to know that the applicant would some two years and eight months afterward assert that the catching of her jacket on the doorknob was the cause of her fall? Particularly is this query pertinent when it is remembered that the statute also makes it the duty of the employee and her doctor to timely report and file a claim where an industrial accident is involved. We see nothing in the conduct of Sears' representatives relative to this matter that may reasonably be said to have induced the applicant to refrain from reporting said accident to the commission if she con-

sidered it as arising in the course of her employment. Furthermore the matter of fraud is not an issue in this case.

We fully recognize that this court is not the trier of the facts, and we have always sustained the action of the commission in cases of conflict of testimony where there was reasonable evidence in the record to support its action. However, decisions of the commission must be judicial and not merely arbitrary or capricious. In the instant case it appears to us that the evidence opposed to the plausibility of the "jacket catching" incident casts such grave suspicion thereon and renders it so flimsy and intrinsically improbable, since it is impeached by applicant's own previous statements and the other extrinsic circumstances surrounding the case, that the award is left without reasonable support in the evidence. For a case with a somewhat similar factual situation see Clarke v. Ward Baking Company, 18 A.2d 727, 19 N.J.Misc. 268.

We are constrained to hold that the action of the commission in the premises was arbitrary and capricious and the award was made without due consideration or a legal basis. There is no occasion to consider the matter of limitation, as such a plea must necessarily be predicated upon the premise that originally there was a compensable accident.

Award set aside.

LA PRADE, C. J., and STANFORD, PHELPS and DE CONCINI, JJ., concur.