40 N.J. Super. 564 (1956)
123 A.2d 815
HENRIETTA M. HOWARD, BY HER GUARDIAN AD LITEM, RALPH O. HOWARD, PETITIONER-APPELLEE,
v.
HARWOOD'S RESTAURANT CO., A NEW JERSEY CORPORATION, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided June 29, 1956.
*566 Mr. Louis C. Jacobson, attorney for petitioner-appellee.
Mr. Isidor Kalisch, attorney for respondent-appellant.
GAULKIN, J.C.C.
The petitioner was awarded workmen's compensation and the respondent appeals. The grounds of appeal are that the petitioner failed to prove the "necessary employment relationship between the parties," that she failed to prove "an accidental injury arising out of" the employment, and that the "Deputy erred in ordering the *567 respondent to provide nursing and medical care subsequent to the time the permanent disability became fixed."

I.
The petitioner (who will hereafter be called Mrs. Howard) is the wife of Ralph O. Howard, president of the respondent corporation. She was secretary of the corporation and a holder of one share of stock. For approximately four years prior to the happening, she assisted in the management of the restaurant operated by respondent, managed the office, purchased some of the supplies, took care of the books, checked the waiters, made deposits, and carried out similar duties. That is not disputed. What is disputed is whether she did it for compensation.
At no time prior to the happening had she received any stated compensation in cash. During those four years she had received only meals and small sums for carfare and incidental expenses. However Mr. Howard testified that from "the first day she came * * * to 44 Commerce Street" which was the location of the restaurant, in 1950, there was an "understanding" between Mrs. Howard and him that she was to receive $50 per week. No such amount was ever paid, nor did the books reflect any such understanding, nor was her salary ever included in the payroll figures submitted to the insurance carrier.
However, early in January 1954, according to the testimony of Mr. Howard, Mrs. Howard became "a little bit concerned about her status  social security, * * * she wanted to make sure she would be properly protected under social security. * * *" Consequently, said Mr. Howard, it was decided by Mrs. Howard and him "that something should be done to take care of the back pay that was due her in some form. Well, the company was in fair shape. It wasn't this good  in good enough shape to pay an amount of $50 a week over a period of four years which ran into many thousands of dollars, so we decided and agreed that I would give her at least the equivalent of one quarter  we would *568 wash away what accumulated and I would start her on the basis of a monthly salary every month, beginning on January 1st."
Pursuant to this arrangement he said he gave her a promissory note dated January 7, 1954 for $650 representing salary for the last 13 weeks of 1953. This note, which was marked in evidence, was typewritten, is to the order of Henrietta M. Howard, and is signed by Mr. Howard in ink, as president of Harwood's Restaurant Co. He said "I gave her 13 weeks of pay, which was a quarter, which she was supposed to set up on the books to put her under social security." No entry was made upon the books of the company to indicate the outstanding note or "to put her under social security."
On January 28, 1954 Mrs. Howard was brutally assaulted with a blunt instrument by one Luico Williamson, a porter and handy man about the restaurant. She was beaten so viciously that she was unconscious for approximately 50 days, remained at the hospital over 100 days, and then after a month and a half at home she was removed to a nursing home where she still remains. She underwent much surgery, including brain and plastic surgery, and tracheotomy. She had multiple skull fractures, a traumatic cataract, paralysis of her left arm and left leg, a fractured jaw and numerous other injuries which justify the statement of counsel "that mere recounting them causes a sense of horror and consternation."
At no time prior to January 28, 1954, the date of the assault, did Mrs. Howard receive any portion of the $50 a week. However, Mr. Howard says that some nine months after the assault he found the note in the office safe, in an envelope upon which there was written in Mrs. Howard's handwriting "Note for salary due H. Howard, last quarter 1953." An inspection of the envelope shows that the above statement was written in a firm even hand. The medical testimony, including the testimony of respondent's doctor, was that it was not possible for Mrs. Howard to have written this at any time after the assault, in view of her physical condition.
*569 The respondent concedes that if this note was executed at the time and under the circumstances stated by Mr. Howard, it would be very strong evidence confirming the alleged salary arrangement, and if the salary arrangement be believed, the petitioner proved her employment. A strong attack was made upon Mr. Howard's credibility and a number of facts were developed, in addition to those mentioned above, which tend to cast doubt upon his veracity. No useful purpose would be served in enumerating those facts, for if it be believed that Mrs. Howard was physically unable to write the legend on the envelope containing the note after the assault, the envelope and note are mute but most persuasive evidence that the arrangement for $50 a week had indeed been entered into. The deputy director, who had the advantage of seeing and hearing the witnesses with all that that includes, believed Mr. Howard. My own reading of the record and examination of the envelope, fortified as it must be by the weight that I must accord to the findings of the deputy, leads me to the conclusion that the arrangement for $50 a week was established, and that the petitioner was an employee receiving that rate of compensation within the meaning of the Workmen's Compensation Act at the time of the assault.
The respondent points to that testimony of Mr. Howard which explained the failure to pay Mrs. Howard the $50 a week on the ground that "the agreement was that she would receive money if and when the company can afford to pay her." The respondent argues that obviously the corporation could not "afford to pay her" since she had not been paid, and there was no assurance that the corporation would ever be able to afford to pay her. Consequently, the respondent argues that the agreement was too uncertain to establish an employment for compensation. To this the case of Mahoney v. Nitroform Co., Inc., 20 N.J. 499, at page 507 (1956), provides the complete answer. First, as that case says, "`the possibility that the condition may happen involves a chance of detriment which is sufficient to make the promise valid consideration.'" Second, the exhibits in evidence *570 show that the company at all times had enough money to pay her $50 a week. The company had other employees, operated a restaurant, and took in substantial sums. It may be that the parties tacitly agreed that the $50 a week was to "ride," to help the working capital position of the restaurant, but that does not destroy the agreement to employ at $50 a week. Third, Mr. Howard says Mrs. Howard was to be paid monthly. If so, the first cash salary payment would not have been due until after the assault.

II.
In support of its argument that petitioner has failed to prove a compensable "accident," the respondent argues that there is no proof that the attack by Williamson upon Mrs. Howard was connected with the employment. Respondent contends that, to quote its brief, "the assault was the result of the actions of a madman." That brief says:
"Luico Williamson, the petitioner's assailant, testified that he had no recollection of having committed the assault but later, concluded that he must have done it from all of the surrounding circumstances. He stated that he had been turning over in his mind some grievance which he had with a woman with whom he had been living. His motive was not robbery, rape or hate. That this is so is borne out by the senseless viciousness of the attack and the fact that no money was taken. Nor is there any evidence of sex involved. It seems quite plain that the assault was the result of the actions of a madman. Williamson's demeanor on the witness stand indicates his lack of mental balance."
The respondent then asks:
"The question then arises whether an assault committed by a person suddenly developing insane impulses upon a co-employee * * * where the motive is subjective to the insane person and bears no relation to the employment constitutes a compensable accident in New Jersey."
The answer is, in the opinion of this court, that such an assault does constitute a compensable accident in New Jersey.
The parties agree that there is no case directly in point *571 in New Jersey. However the majority of the states in which the question has arisen hold such an injury to be compensable, and the trend of the New Jersey cases certainly is in that direction.
Larson (1 Workmen's Compensation Law, section 11.32 (a) says:

"11.32(a) Assaults by insane co-employees
If claimant is assaulted by a co-employee who becomes irresponsible because of insanity, the great majority of decisions hold that the injury arose out of the employment, and it is immaterial whether or not the employer had knowledge of the assailant's condition or propensities. The reason for this rule was well stated by the Connecticut Supreme Court:
`When an employer puts an employee at work on a machine, although the employer may have exercised all reasonable care to provide that it is safe, * * * which, without fault on his part, has a latent defect, which causes it to break down and injure the employee, the injury is unquestionably one arising out of a condition of his employment. It is immaterial, under the act, whether the employer knew or ought to have known of the existence of the dangerous condition * * * So in this case, although the employer may not have had knowledge actual or constructive that Markus, a fellow servant of the plaintiff, was insane and liable to run amuck, yet such liability of Markus to run amuck was in fact a condition under which the plaintiff was employed on the night in question, and, if such condition of Markus caused an injury to the plaintiff, as it did, then the injury to the plaintiff arose out of his employment as truly as if it had arisen from the negligence of Markus in doing his work.'"
See Pacific Employers Insurance Co. v. Industrial Accident Commission, 293 P.2d 502 (Cal. D. Ct. App. 1956); Anderson v. Security Bldg. Co., 100 Conn. 373, 123 A. 843, 40 A.L.R. 1119 (Sup. Ct. Err. 1924), which is the case from which Larson quotes, supra; Chadwick v. White Provision Co., 82 Ga. App. 249, 60 S.E.2d 551 (Sup. Ct. 1950); Petroleum Casualty Co. v. Kincaid, 93 S.W.2d 499 (Tex. Ct. Civ. App. 1936); John H. Kaiser Lumber Co. v. Industrial Commission of Wisc., 181 Wis. 513, 195 N.W. 329 (Sup. Ct. 1923); Wakefield v. World-Telegram, 249 App. Div. 884, 292 N.Y.S. 588 (App. Div. 1937), affirmed 274 N.Y. 517, 10 N.E.2d 527 (Ct. App. 1937); Charbazian v. Regina Novelty Corp., 257 App. Div. 1097, *572 14 N.Y.S.2d 654 (App. Div. 1939); Herman v. Quick, 281 App. Div. 784, 118 N.Y.S.2d 728 (App. Div. 1953); Pawnee Ice Cream Co. v. Cates, 164 Okl. 48, 22 P.2d 347 (Sup. Ct. 1933).
The basis of this view is akin to the "positional or but-for" doctrine which appears, in large measure, to have been adopted in New Jersey. Gargiulo v. Gargiulo, 13 N.J. 8 (1953); Gargano v. Essex County News Co., 129 N.J.L. 369 (Sup. Ct. 1943) affirmed 130 N.J.L. 559 (E. & A. 1943); Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443 (E. & A. 1942); Sanders v. Jarka Corp., 1 N.J. 36 (1948).
In addition, there is testimony upon which one might well conclude that Williamson assaulted Mrs. Howard when she refused to advance him any money. Williamson had borrowed money in this fashion before. When Mrs. Howard's deposition was taken she said:
"Q. Mrs. Howard, who is Luico?
A. I'm listening to him.
Q. Who is Luico, Mrs. Howard?
A. He is the one that started this whole story.
Q. Who is Luico?
A. Colored.
Q. Who is he?
A. He wanted some money and I wouldn't give it to him.
Q. So what did he do to you?
A. Hit me over the back of the head."
Although her condition is such that one must be cautious in accepting her testimony, there was other testimony which might be said to tend to corroborate this. However, no useful purpose would be served by detailing it, because "where, as here, there are two different versions as to how the accident occurred * * * [and] either version makes it a compensable accident, an award should be granted." Link v. Eastern Aircraft, 136 N.J.L. 540 (E. & A. 1948).
It is, therefore, concluded that the petitioner suffered a compensable accident.

*573 III.
Finally, the respondent argues that "the deputy director erred in ordering the respondent to provide nursing and medical care subsequent to the time when the permanent disability became fixed."
In support of this point, the respondent argues that R.S. 34:15-15 provides that "the employer shall furnish to the injured workman such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the workman of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible," and since all of the doctors agree that Mrs. Howard is totally, permanently and hopelessly disabled, and beyond cure or restoration, the respondent may not be required to provide nursing and medical care in the future. Respondent cites in support of this argument Coates v. Warren Hotel, 18 N.J. Misc. 122 (N.J. Dept. Labor 1940); LeClair v. Textron Mills Inc., 77 R.I. 318, 75 A.2d 309 (Sup. Ct. 1950) and Peek v. Ayres Auto Supply, 155 Neb. 233, 51 N.W.2d 387 (Sup. Ct. 1952).
The subject is discussed, among other places, in Larson, supra, section 61.14; 58 Am. Jur., p. 804, section 328; and in a note in 88 A.L.R. 1192. Respondent's argument involves the construction of the words "relieve the workman of the effects of the injury." However, before embarking on such construction, it is well to remember the caution sounded by the Illinois Supreme Court when it considered a similar statute in the case of W.J. Newman Co. v. Industrial Commission, 353 Ill. 190, 187 N.E. 137, 138, 88 A.L.R. 1188 (1933). It said:
"* * * caution is required in the construction of the particular statute so as not to extend it or affect its general application to the thousands of other cases not presenting such unusual features."
As in the Newman case, the case at bar presents "unusual features." Without attempting to lay down any general rule to apply to all cases, it is clear to this court that *574 in this case the obligation of the respondent to continue to provide nursing and medical care after the permanent disability became fixed cannot be disputed. Mrs. Howard will never be able to get out of bed and will never be able to take care of herself. Respondent's own doctor, after describing her horrible injuries and her paralysis, stated that she has to be taken care of "in a nursing home or at home with nurses"; that she is "totally incapable of caring for herself * * * has to be fed * * * has to be watched * * * she needs nursing care. She needs medical supervision to prevent complications * * * she has convulsions and she should be taking medication * * * under the supervision of a physician." Petitioner's doctor testified that because of the injury to the brain Mrs. Howard is suffering from convulsions which will continue, "sometimes * * * three or four attacks within a few days and then they'll go along two or three weeks without." Constant medical attention and nursing is necessary, he said, to prevent complications such as pneumonia, kidney and skin infections, and to take care of her bowels, bladder and nutrition.
In the Newman case, Nee had suffered a fractured spine with resulting paralysis from the hips down. The court said:
"The medical evidence was that his condition was that of permanent total disability, and that no medical, surgical or hospital treatment or services could reduce his disability or restore him to any gainful occupation. From the date of his injury to the present time he has been in Henrotin Hospital, in Chicago. The services of some person are required to keep him in a clean and sanitary condition and to lift or move him about. He requires attention as to the functioning of the bowels and urination and is seen at times by a physician, who gives him prescriptions when needed."
The court held that future medical services were therefore "reasonably necessary to relieve the employee from the effects of his injury." It said:
"Reference to the record clearly shows that Nee is beyond hope of cure from medical skill. It further shows that the medical, surgical, and hospital services he has been and is now receiving are not *575 only necessary but also adequate to relieve him, as far as possible, from the effects of his injury. * * * We are therefore left solely with the question whether, by a construction of paragraph (a) of section 8 of the Workmen's Compensation Act [S.H.A. Ill. Ch. 48, § 145 (a)], this court can say * * * that when an employer has done that which is reasonably required to cure an injured employee from the effects of his injury and medical advice indicates that a cure is hopeless, the employer is thereafter relieved from any further liability, under the act, to furnish medical, surgical, and hospital services. We cannot adopt any such literal or strained construction of paragraph (a) as plaintiff in error urges in this case, to the effect that the words `cure' and `relieve' mean virtually the same thing. A workman who is cured is, of course, relieved from the effects of his injury, but one who is incurable, as in the present case, may still need skillful attention to relieve him of pain or other injurious effects caused by his injury. This is only the natural and usual meaning of the words used. It is a construction in accordance with the general spirit and humane purpose of the act. The Workmen's Compensation Act is a humane law of a remedial nature, and wherever construction is permissible its language should be liberally construed."
As to the cases cited by respondent, suffice it to say that all of them are distinguishable on the facts. See also Van-Tuyl v. Federal Shipbuilding & Dry Dock, 29 N.J. Super. 286 (Cty. Ct. 1954) affirmed 32 N.J. Super. 406 (App. Div. 1954); DiGiorgio Fruit Corp. v. Pittman, 49 So.2d 600 (Fla. Sup. Ct. 1950).
For the foregoing reasons, my conclusions are the same as those of the deputy below and he is in all respects affirmed.